1                 **IN THE UNITED STATES DISTRICT COURT**
                   **FOR THE WESTERN DISTRICT OF TEXAS**
 2                          **AUSTIN DIVISION**

 3   UNITED STATES OF AMERICA,           )  AU:17-M-00073(1)
                                         )  1:17-CR-132-LY
 4       Plaintiff,                      )
                                         )
 5   v.                                  )  AUSTIN, TEXAS
                                         )
 6   JUAN CARLOS CORONILLA-GUERRERO,     )
                                         )
 7       Defendant.                      )  MARCH 20, 2017

 8           **********************************************
                  TRANSCRIPT OF PROBABLE CAUSE HEARING
 9            BEFORE THE HONORABLE ANDREW W. AUSTIN
             **********************************************
10

     FOR THE PLAINTIFF:        MARK H. MARSHALL
11                             UNITED STATES ATTORNEY'S OFFICE
                               816 CONGRESS AVENUE, SUITE 1000
12                             AUSTIN, TEXAS 78701

13   FOR THE DEFENDANT:        DAVID M.C. PETERSON
                               FEDERAL PUBLIC DEFENDER'S OFFICE
14                             504 LAVACA STREET, SUITE 960
                               AUSTIN, TEXAS 78701
15
     INTERPRETER:              PETER HEIDE
16
     TRANSCRIBER:              ARLINDA RODRIGUEZ, CSR
17                             501 WEST 5TH STREET, SUITE 4152
                               AUSTIN, TEXAS 78701
18                             (512) 391-8791

19

20                         **EXAMINATION INDEX**

21   LA RON BRYANT
           DIRECT BY MR. MARSHALL . . . . . . . . . . . . . . . 2
22         CROSS BY MR. PETERSON . . . . . . . . . . . . . . 10
           REDIRECT BY MR. MARSHALL . . . . . . . . . . . . 28
23

24   Proceedings recorded by electronic sound recording, transcript

25   produced by computer.

| | | |
|---|---|---|
| 13:57:37 | 1 | (Proceedings began at 10:02 a.m.) |

13:57:37  1      (Proceedings began at 10:02 a.m.)

13:57:37  2          THE CLERK:  The Court calls 17-M-73, *United States v.*

13:58:04  3  *Juan Carlos Coronilla-Guerrero*, for a preliminary hearing.

13:58:05  4          MR. MARSHALL:  Mark Marshal for the United States.

13:58:07  5          THE COURT:  Mark.

13:58:08  6          MR. MARSHALL:  Good morning.

13:58:10  7          MR. PETERSON:  Good morning, Your Honor.

13:58:17  8  David Peterson for Mr. Coronilla-Guerrero.

13:58:33  9          THE COURT:  Good morning.  We've got the

13:58:37 10  government -- or the defendant's response to the detention

13:58:40 11  hearing, so I guess we're here on the preliminary?

13:58:43 12          MR. PETERSON:  That's correct, Your Honor.

13:58:44 13          THE COURT:  All right.  Mr. Marshall?

13:58:47 14          MR. MARSHALL:  My understanding is detention is

13:58:56 15  waived.

13:59:00 16          THE COURT:  Correct.  So I'll recognize the

13:59:04 17  government for the preliminary.

13:59:05 18          MR. MARSHALL:  Call the Agent La Ron.

13:59:14 19          THE COURT:  Agent.

13:59:23 20      (Witness sworn)

13:59:37 21                    **LA RON BRYANT,**

13:59:37 22  having been first duly sworn, testified as follows:

13:59:37 23                  **DIRECT EXAMINATION**

13:59:37 24  **BY MR. MARSHALL:**

13:59:37 25  Q.  Once you get settled, go ahead and tell us your name and

| | | |
|---|---|---|
| 13:59:44 | 1 | spell your name for the record, please. |
| 13:59:47 | 2 | A.   My name is La Ron Bryant, L-a R-o-n, last name, Bryant, |
| 13:59:53 | 3 | B-r-y-a-n-t. |
| 13:59:55 | 4 | Q.   How are you employed, sir? |
| 13:59:57 | 5 | A.   I'm a deportation officer with Immigration and Customs |
| 14:00:09 | 6 | Enforcement. |
| 14:00:11 | 7 | Q.   What are your duties and responsibilities as a deportation |
| 14:00:18 | 8 | officer? |
| 14:00:18 | 9 | A.   Some of my duties and responsibilities are to apprehend |
| 14:00:22 | 10 | and locate people who are illegally in the country and deport |
| 14:00:34 | 11 | them back to their native country. |
| 14:00:36 | 12 | Q.   How long have you been engaged in that activity? |
| 14:00:39 | 13 | A.   I've been with the Department of Homeland Security for |
| 14:01:40 | 14 | 14 years. |
| 14:01:41 | 15 | Q.   All right.  Prior to that, what experience did you have? |
| 14:01:44 | 16 | A.   Prior to that I was a U.S. Border Patrol agent.  I was |
| 14:01:48 | 17 | also a U.S. Federal Probation officer and as well as I worked |
| 14:01:57 | 18 | for U.S. Immigration and -- Citizenship -- excuse me -- |
| 14:02:02 | 19 | Immigration Service. |
| 14:02:03 | 20 | Q.   The customs enforcement side -- the customs side of it? |
| 14:02:17 | 21 | A.   No.  No. Citizenship and Immigration Service, the benefit |
| 14:02:25 | 22 | side.  I was an asylum officer for two years in Houston, Texas. |
| 14:02:34 | 23 | Q.   So you're familiar with pretty much most of the aspects of |
| 14:02:39 | 24 | immigration and customs enforcement? |
| 14:02:45 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 14:02:45 | 1 | Q.   All right.   In that regard, did you and other officers |
| 14:02:55 | 2 | have occasion to encounter Juan Carlos Coronilla-Guerrero? |
| 14:02:59 | 3 | A.   Yes, we did. |
| 14:03:07 | 4 | Q.   About when was that? |
| 14:03:15 | 5 | A.   That was March 3rd at the county courthouse here in |
| 14:03:19 | 6 | Travis County. |
| 14:03:19 | 7 | Q.   Let's back up a little bit. |
| 14:03:26 | 8 |      Prior to that had a warrant been issued for the |
| 14:03:28 | 9 | defendant? |
| 14:03:28 | 10 | A.   Yes. |
| 14:03:29 | 11 | Q.   When was that? |
| 14:03:30 | 12 | A.   I believe that was -- the warrant was issued February 1st. |
| 14:03:39 | 13 | Let me check. |
| 14:04:22 | 14 |      MR. MARSHALL:  May I approach? |
| 14:04:28 | 15 |      THE COURT:  You may. |
| 14:04:32 | 16 | Q.   (BY MR. MARSHALL) I know you've got a bunch of papers in |
| 14:04:37 | 17 | front of you. |
| 14:04:37 | 18 | A.   Yes. |
| 14:04:40 | 19 | Q.   I'll show you a copy of the complaint.  Is there a file |
| 14:04:51 | 20 | date on there? |
| 14:04:52 | 21 | A.   Yes.  February 3rd. |
| 14:04:55 | 22 | Q.   And would that be the date the warrant was issued as well? |
| 14:05:00 | 23 | A.   Yes, sir. |
| 14:05:05 | 24 | Q.   All right.  In that particular complaint, the defendant's |
| 14:05:10 | 25 | charged with illegal reentry, is he not? |

BRYANT - DIRECT                                          5

```
14:05:12   1   A.   Correct.

14:05:13   2   Q.   So somebody who has previously been deported, has come

14:05:17   3   back illegally, and then --

14:05:19   4   A.   Yes.

14:05:19   5   Q.   -- found in the United States?

14:05:21   6   A.   Correct.

14:05:21   7   Q.   On or about when was the defendant encountered for

14:05:31   8   purposes of the complaint in this case?

14:05:33   9   A.   He was encountered on July -- he was encountered in

14:05:42  10   January after his subsequent arrest by Austin Police

14:05:46  11   Department.

14:05:47  12   Q.   That would be on or about January 10th of 2017?

14:05:56  13   A.   Correct.

14:05:56  14   Q.   All right.  How did Immigration and Customs Enforcement

14:06:00  15   find out about that?

14:06:01  16   A.   Our command center in San Antonio field office placed a

14:06:15  17   detainer based off of biometric confirmation.  His

14:06:25  18   fingerprints, once he was arrested, were enrolled into the IFS

14:06:41  19   system and NCIC and they got a notification.

14:06:44  20   Q.   All right.  Based on that somebody went ahead and compared

14:06:52  21   it to his A-file and found out that he was illegally here?

14:07:02  22   A.   Correct.  And placed a detainer.

14:07:08  23   Q.   Then the complaint was subsequently filed on February 3rd?

14:07:11  24   A.   Correct.

14:07:12  25   Q.   All right.  You indicated that on or about what date did
```

14:07:18  1  you encounter the defendant?

14:07:25  2  A.    March 3rd, 2017.

14:07:33  3  Q.    How did that come about?

14:07:49  4  A.    We were told by our management that the defendant would be

14:07:57  5  at the county courthouse and to go ahead and go to the county

14:08:02  6  courthouse and arrest the individual based off of the arrest

14:08:11  7  warrant we had.

14:08:12  8  Q.    All right.  So you -- what did you take with you to the

14:08:15  9  courthouse?

14:08:16  10  A.    We -- we took -- we call it a temporary file jacket, which

14:08:19  11  has the defendant's photo, biographical information, the arrest

14:08:24  12  warrant.

14:08:24  13  Q.    Why do you take that stuff with you?

14:08:27  14  A.    Just so we can confirm that we are arresting the correct

14:08:30  15  individual.

14:08:35  16  Q.    All right.  Did you get to the courthouse?

14:08:38  17  A.    Yes, we did.

14:08:39  18  Q.    All right.  Once you got to the courthouse, what did you

14:08:42  19  do?

14:08:42  20  A.    We went upstairs to the court area that we knew the

14:08:52  21  defendant was going to be attending court at, and we -- we

14:08:56  22  waited.  The -- we waited outside to see if -- if the

14:09:01  23  individual was going to actually show.  I myself went inside,

14:09:06  24  talked to the courtroom deputy, told him who I was, why I was

14:09:15  25  here.  He confirmed that the defendant was here in the

| | | |
|---|---|---|
| 14:09:21 | 1 | courtroom, and then I went back outside and waited. |
| 14:09:25 | 2 | Q.   All right.  What did you observe after you were waiting? |
| 14:09:28 | 3 | A.   While we were waiting, we saw the defendant come out of |
| 14:09:31 | 4 | the courtroom on a cell phone and walk towards the elevators, |
| 14:09:39 | 5 | we assumed heading -- trying to leave the court -- the court |
| 14:09:48 | 6 | area. |
| 14:09:48 | 7 | Q.   All right.  Was he with anybody? |
| 14:09:50 | 8 | A.   At the time, no.  He was by himself. |
| 14:09:56 | 9 | Q.   Okay.  What happened? |
| 14:09:59 | 10 | A.   Then the defendant got in the elevator, and myself and |
| 14:10:05 | 11 | Officer Warren also got in the elevator.  As we rode the |
| 14:10:15 | 12 | elevator, it was later found out that the defendant's attorney, |
| 14:10:18 | 13 | Mr. Betts, was inside the elevator as well. |
| 14:10:22 | 14 | Q.   All right. |
| 14:10:22 | 15 | A.   And then we rode the elevator down to the first floor. |
| 14:10:27 | 16 | Everybody exited except for the defendant and the attorney. |
| 14:10:37 | 17 | They stayed on.  So I stayed on the elevator as well.  We went |
| 14:10:41 | 18 | down to the ground floor, and the defendant's attorney, |
| 14:10:44 | 19 | Mr. Betts, asked me if I was going to get off on the ground |
| 14:10:47 | 20 | floor.  I told him no.  We -- he asked me what floor.  I told |
| 14:10:59 | 21 | him the first floor.  When we got to the first floor, I |
| 14:11:03 | 22 | identified myself who I was and -- and what my purpose of being |
| 14:11:13 | 23 | there at the court. |
| 14:11:15 | 24 | Q.   Did you have any other interaction with Mr. Betts? |
| 14:11:24 | 25 | A.   Only when we advised the defendant of his rights, asked -- |

BRYANT - DIRECT                                           8

14:11:37  1  identified who he was, and confirmed it was him and showed

14:11:49  2  Mr. Betts the arrest warrant that we had for him.

14:11:52  3  Q.   So his attorney was there all this time?

14:11:54  4  A.   Correct.

14:12:06  5  Q.   Including when you advised his client of his rights?

14:12:22  6  A.   Correct.

14:12:22  7  Q.   All right.  What happened after that?

14:12:28  8  A.   After that we exited the courtroom lobby and we walked

14:13:34  9  with the defendant to our vehicle.  We searched him and placed

14:13:46  10  handcuffs on him.

14:13:47  11  Q.   You didn't cuff him inside the courthouse?

14:13:49  12  A.   No, we did not.

14:13:50  13  Q.   You didn't cuff him immediately outside the courthouse?

14:13:54  14  A.   No, we did not.

14:13:55  15  Q.   You didn't enter the courtroom to arrest him?

14:14:02  16  A.   No, we did not.

14:14:03  17  Q.   All right.  What happened?

14:14:06  18  A.   We placed the handcuffs on the defendant, searched him --

14:14:10  19  searched his area to make sure he didn't have any other weapons

14:14:14  20  or anything on him.  Placed him in our vehicle and took him

14:14:32  21  back to the Austin resident office.

14:14:34  22  Q.   All right.  Did the defendant make any statements after he

14:14:38  23  had been advised of his constitutional rights?

14:14:41  24  A.   No.  Other ...

14:14:50  25  Q.   Did you talk about his immigration status?

14:14:57   1    A.    When we -- when we got to -- to the office, we --

14:15:04   2    Q.    Okay.  What did he tell you?

14:15:05   3    A.    He told us that he was here illegally, and that's pretty

14:15:10   4    much it.  Then he advised us that he wanted his attorney

14:15:28   5    present for anything -- any further questioning.

14:15:30   6    Q.    Did you stop questioning him?

14:15:35   7    A.    Yes, we did.

14:15:36   8    Q.    Okay.  Did you pull his A-file and -- you and other agents

14:15:43   9    pull his A-file, or his immigration file, to determine whether

14:15:46  10    or not he was in the country legally or illegally?

14:15:49  11    A.    Yes.  We did pull it.

14:15:50  12    Q.    What did you find?

14:15:52  13    A.    We found the defendant had been deported before and that

14:16:01  14    there was no other evidence or proof in the A-file or in our

14:16:05  15    systems to show that he's applied for admission or had any

14:16:22  16    petitions pending.

14:16:23  17    Q.    All right.  Specifically in your A-file did you find an

14:16:28  18    order for removal from an immigration judge dated on or about

14:16:38  19    July 30, 2008?

14:16:40  20    A.    Yes, we did.

14:16:41  21    Q.    Subsequent to that did you also find a declaration from an

14:16:45  22    immigration officer, that they had actually witnessed his

14:16:48  23    deportation on or about July 31st, 2008?

14:16:51  24    A.    Yes, we did.

14:16:52  25    Q.    Is there any indication the defendant applied for

14:16:55   1   readmission into the United States?

14:16:57   2   A.   None that we found.

14:16:58   3   Q.   Was there any indication he applied for asylum or he

14:17:02   4   applied for any benefits under the Immigration and Customs

14:17:06   5   Enforcement purview?

14:17:07   6   A.   No.

14:17:08   7   Q.   No appeals?  Nothing?

14:17:11   8   A.   No, sir.

14:17:11   9   Q.   All right.  In that regard, is it your belief that he was

14:17:17   10  illegally in the country after you placed him under arrest?

14:17:20   11  A.   Yes, I do.

14:17:36   12           MR. MARSHALL:  Pass the witness.

14:17:37   13           THE COURT:  Mr. Peterson?

14:17:39   14                     **CROSS-EXAMINATION**

14:17:39   15  **BY MR. PETERSON:**

14:17:40   16  Q.   Agent Bryant, I have a few questions about the

14:17:48   17  circumstances of Mr. Coronilla-Guerrero's apprehension and how

14:17:51   18  you or your office developed probable cause that it was him

14:17:55   19  there at the courthouse.

14:17:58   20           The -- you stated the complaint in this case was

14:18:01   21  sworn out on February 3rd?

14:18:02   22  A.   Correct.

14:18:03   23  Q.   You didn't swear out that complaint, correct?

14:18:11   24  A.   I'm not sure.

14:18:12   25  Q.   If I show you the complaint, you'll be able to

BRYANT - CROSS                                                    11

| | | |
|---|---|---|
| 14:18:15 | 1 | double-check that, right? |
| 14:18:16 | 2 | A.   Yes.   No.   It was not me. |
| 14:18:25 | 3 | Q.   So you've had a chance to review the complaint? |
| 14:18:31 | 4 | A.   Yes. |
| 14:18:33 | 5 | Q.   And it was Agent Mathis that swore out that complaint, |
| 14:18:38 | 6 | right? |
| 14:18:38 | 7 | A.   Correct. |
| 14:18:38 | 8 | Q.   On February 3rd did you know anything about this case? |
| 14:18:44 | 9 | A.   Other than the -- the complaint and the arrest warrant |
| 14:18:48 | 10 | being issued, yes. |
| 14:18:49 | 11 | Q.   Okay.   So you were aware on February 3rd that the |
| 14:18:52 | 12 | complaint and arrest warrant had been issued? |
| 14:18:54 | 13 | A.   Correct. |
| 14:18:55 | 14 | Q.   Okay.   At that time, on February 3rd, did you know where |
| 14:18:59 | 15 | Mr. Coronilla-Guerrero was? |
| 14:19:00 | 16 | A.   No, I did not. |
| 14:19:02 | 17 | Q.   And how did you determine where he was?   What efforts were |
| 14:19:08 | 18 | made by ICE to determine his location so that you could effect |
| 14:19:13 | 19 | the arrest warrant? |
| 14:19:15 | 20 | A.   The only thing I know is that on March 3rd I was asked by |
| 14:19:19 | 21 | our management to accompany Officer Warren to effect the arrest |
| 14:19:23 | 22 | warrant.   Other than that I had nothing else to do with the |
| 14:19:26 | 23 | case. |
| 14:19:26 | 24 | Q.   Okay.   Do you know what the hearing was relating to his |
| 14:19:34 | 25 | state court case on March 3rd that you went to? |

BRYANT - CROSS

14:19:37   1   A.   No.

14:19:37   2   Q.   Okay.   And as far as you know, when the magistrate judge

14:19:43   3   signed the criminal complaint and federal arrest warrant on

14:19:46   4   February 3rd, did anyone advise or notify

14:19:49   5   Mr. Coronilla-Guerrero that this was a federal arrest warrant

14:19:57   6   for him?

14:20:02   7   A.   Not that I know of.

14:20:03   8   Q.   No one advised his attorney, Mr. Betts, either, right?

14:20:07   9   A.   Not that I know of.

14:20:08   10  Q.   No one attempted to serve the arrest warrant at his home,

14:20:12   11  correct?

14:20:12   12  A.   Not that I know of.

14:20:13   13  Q.   And nor at his attorney's office?

14:20:16   14  A.   Not that I know of.

14:20:17   15  Q.   Okay.   So you said you personally made the arrest at the

14:20:21   16  county courthouse?

14:20:22   17  A.   Correct.

14:20:22   18  Q.   How many agents were there that day?

14:20:26   19  A.   It was Officer Teddy Warren and myself.

14:20:29   20  Q.   Okay.   Two -- two agents from ICE that day?

14:20:32   21  A.   Correct.

14:20:33   22  Q.   Any agents from other agencies working with you-all that

14:20:36   23  day?

14:20:36   24  A.   No, sir.

14:20:37   25  Q.   Okay.   I'm going to ask you to be a little more specific.

| | | |
|---|---|---|
| 14:20:40 | 1 | You've said twice now you were told by management to do this. |
| 14:20:43 | 2 | But you have a supervisor, correct? |
| 14:20:45 | 3 | A.   Correct. |
| 14:20:46 | 4 | Q.   Were you told by your supervisor to effect the arrest? |
| 14:20:49 | 5 | A.   No.   We're talking about -- we were told by our AFOD, |
| 14:21:02 | 6 | which is above our supervisor. |
| 14:21:04 | 7 | Q.   Sorry.   I don't know? |
| 14:21:05 | 8 | A.   Assistant Field Office Director.   He's our -- our |
| 14:21:15 | 9 | supervisor's supervisor. |
| 14:21:17 | 10 | Q.   Okay.   And that's who told you to effect the arrest at the |
| 14:21:31 | 11 | country courthouse? |
| 14:21:32 | 12 | A.   Correct. |
| 14:21:32 | 13 | Q.   That day were you in uniform? |
| 14:21:37 | 14 | A.   No, I was -- no, I was not. |
| 14:21:39 | 15 | Q.   Okay.   Was -- the other agent, Warren, in uniform? |
| 14:21:43 | 16 | A.   We don't wear uniforms. |
| 14:21:45 | 17 | Q.   Do you wear any -- any external indicators that you are |
| 14:21:49 | 18 | with Immigration and Customs Enforcement? |
| 14:21:55 | 19 | A.   Our badge and credentials. |
| 14:22:07 | 20 | Q.   Okay.   And you had your badge and credentials that day, I |
| 14:22:21 | 21 | assume? |
| 14:22:22 | 22 | A.   Correct. |
| 14:22:22 | 23 | Q.   Where did you have them displayed? |
| 14:22:27 | 24 | A.   I had them on my hip. |
| 14:22:33 | 25 | Q.   Your hip.   Okay.   How many arrests have you personally |

| | | |
|---|---|---|
| 14:22:38 | 1 | made at a county courthouse? |
| 14:22:40 | 2 | A.   Can you be -- I mean, I don't understand your question. |
| 14:22:42 | 3 | Q.   As an ICE agent, how many times have you effected an |
| 14:22:46 | 4 | arrest at a county courthouse? |
| 14:22:48 | 5 | A.   Lifetime or recently? |
| 14:22:50 | 6 | Q.   Lifetime.  Let's start with that. |
| 14:22:53 | 7 | A.   I -- I couldn't give you a number.  I mean, I really |
| 14:23:00 | 8 | can't -- can't remember all of them. |
| 14:23:04 | 9 | Q.   Okay.  So you've made numerous arrests at county |
| 14:23:10 | 10 | courthouses? |
| 14:23:11 | 11 | A.   Correct. |
| 14:23:12 | 12 | Q.   How many arrests have you made at the Travis County |
| 14:23:15 | 13 | Courthouse before this? |
| 14:23:16 | 14 | A.   This was the only one. |
| 14:23:17 | 15 | Q.   Okay.  And how long have you been working in the -- in the |
| 14:23:24 | 16 | Travis County office? |
| 14:23:25 | 17 | A.   Since June of 2016. |
| 14:23:27 | 18 | Q.   Okay.  So in your experience arresting folks at the |
| 14:23:46 | 19 | courthouse, I'm asking questions now about how you identified |
| 14:23:52 | 20 | Mr. Coronilla-Guerrero.  A courthouse can be a busy place, |
| 14:23:56 | 21 | right? |
| 14:23:57 | 22 | A.   Uh-huh. |
| 14:23:57 | 23 | Q.   There's lots of individuals coming and going, right? |
| 14:24:00 | 24 | A.   Yes. |
| 14:24:01 | 25 | Q.   So beforehand what -- how was your plan to identify |

14:24:05   1   Mr. Coronilla-Guerrero at the courthouse?

14:24:08   2   A.   Our plan was to -- to go there, see who was there,

14:24:13   3   identify ourselves, and make the arrest.  I mean, there's --

14:24:18   4   there's no set plan as far as, you know, you've got to do A to

14:24:23   5   get to B to get to C.  I mean, we -- we had an arrest warrant.

14:24:27   6   We had a photo identity of him, so we knew what he looked like.

14:24:32   7   We knew he was going to be there because when I talked to the

14:24:38   8   deputy -- court deputy, he acknowledged that he did so check in

14:24:46   9   or his attorney checked in.  We didn't know if it was actually

14:24:54  10   Mr. Coronilla who checked in, but they did advise us that

14:25:11  11   somebody did check in.

14:25:13  12   Q.   Got it.  Got it.  So you've said that you spoke with the

14:25:23  13   courtroom deputy or the bailiff?  I was a little confused?

14:25:26  14   A.   Bailiff.  I don't know.

14:25:28  15   Q.   The uniformed officer in court there?

14:25:31  16   A.   Correct.  The uniformed officer.

14:25:33  17   Q.   And before entering the courtroom, who did you notify at

14:25:37  18   the courthouse that you were going to be there effecting an

14:25:40  19   arrest?

14:25:41  20   A.   No one.

14:25:42  21   Q.   Okay.  And before entering the courthouse, who did you

14:25:45  22   identify?

14:25:47  23            MR. MARSHALL:  At this point I'm going to object to

14:25:49  24   the relevance.

14:25:50  25            THE COURT:  I'll overrule it for now.

BRYANT - CROSS                                             16

14:25:52   1   Q.   (BY MR. PETERSON) I'm basically done with that line of

14:26:07   2   questioning.  But, according to media reports, you-all actually

14:26:15   3   first went to the civil courthouse and then had to go over to

14:26:18   4   the criminal courthouse; is that correct?

14:26:20   5   A.   We -- went by -- well, define which is the civil

14:26:23   6   courthouse because, like I said, I'm relatively new to this

14:26:27   7   area.  So ...

14:26:32   8   Q.   You went to a different courthouse first before you went

14:26:34   9   to the courthouse where you eventually arrested

14:26:38  10   Mr. Coronilla-Guerrero?

14:26:39  11   A.   Correct.

14:26:39  12   Q.   Okay.  Did you let the folks at that courthouse know your

14:26:44  13   purpose of going?

14:26:46  14   A.   Well, we went in to where the security is of that civil

14:26:52  15   courthouse, and we just asked him what -- which courthouse was

14:26:55  16   the right building.  We didn't go upstairs.  We didn't make

14:26:59  17   it -- didn't go into any courtroom or anything.  Just pretty

14:27:02  18   much on the lobby floor.

14:27:08  19   Q.   Okay.  And I want to speak with you briefly about the

14:27:14  20   security in a courthouse and the security measures that you

14:27:21  21   used in this case.

14:27:22  22        Now, if you're not actually courthouse security, when

14:27:26  23   entering a courthouse, you can't bring weapons, right?

14:27:31  24   A.   I can't speak for another agency.  I don't know their

14:27:35  25   rules and procedures.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

BRYANT - CROSS

14:27:36  1  Q.   Okay.  Well, let's -- as an example of this, entering this

14:27:41  2  courthouse, if you have a weapon, you have to check it

14:27:43  3  downstairs, right?

14:27:44  4  A.   Correct.

14:27:44  5  Q.   And if you have restraints or handcuffs, you have to check

14:27:48  6  those downstairs, right?

14:27:50  7  A.   Correct.

14:27:50  8  Q.   And, generally, as far as you know, the only people armed

14:27:54  9  in this courthouse are those tasked with courthouse security

14:27:57  10  here, right?

14:27:58  11  A.   Correct.

14:27:58  12  Q.   So when you went into the county courthouse on March 3rd,

14:28:05  13  you had to check any weapons that you -- any service weapons

14:28:08  14  that you had brought with you, correct?

14:28:09  15  A.   Correct.

14:28:10  16  Q.   Did you do that?

14:28:11  17  A.   Yes, we did.

14:28:12  18  Q.   Okay.  And you also had to check or leave any restraints,

14:28:18  19  correct?

14:28:19  20  A.   Correct.

14:28:19  21  Q.   By that I mean handcuffs.  You didn't have any handcuffs

14:28:22  22  on you when you effected the arrest of Mr. Coronilla?

14:28:24  23  A.   Yes, we did.

14:28:38  24  Q.   You were able to bring handcuffs into the courthouse?

14:28:42  25  A.   Yes, we were.

BRYANT - CROSS                                                    18

14:28:43  1   Q.   So the arrest was effected without weapons, but with

14:28:46  2   handcuffs?

14:28:47  3   A.   The arrest was effected outside the courthouse.  Not at

14:28:53  4   any time was Mr. Coronilla -- handcuffs were placed on him

14:28:55  5   inside the courthouse building.

14:29:00  6   Q.   Okay.  So he -- inside the courthouse you're saying he was

14:29:04  7   not under arrest, for example, in the elevator?

14:29:10  8   A.   Well, when we exited the elevator, we -- we spoke to him,

14:29:20  9   we advised him of his rights, we told him we were going to

14:29:23  10  arrest him.  And we asked him to walk with us, and he walked

14:29:26  11  with us.

14:29:26  12  Q.   Okay.  And you had not asked the county courthouse

14:29:37  13  officials to assist you with the arrest?

14:29:39  14  A.   No.  There was no officials when, like I said, we came out

14:29:47  15  to the lobby.

14:29:50  16  Q.   Okay.  And going back to when you asked him to go with you

14:29:54  17  outside, he complied, correct?

14:29:56  18  A.   Correct.

14:29:56  19  Q.   He didn't resist?

14:29:58  20  A.   No.

14:30:00  21  Q.   And, once he was on the elevator with you-all, he didn't

14:30:05  22  at any time try and flee?

14:30:10  23  A.   No.

14:30:11  24          MR. PETERSON:  I have no further questions,

14:30:13  25  Your Honor.

14:30:13  1                    MR. MARSHALL:  No questions.

14:30:14  2                    THE COURT:  All right.  I'm curious.  Let me ask a

14:30:18  3      couple of questions of you, if I could, officer.

14:30:22  4                    So you didn't have restraints with you in the

14:30:26  5      elevator or in the courtroom?

14:30:28  6                    THE WITNESS:  No.  We did have restraints on us,

14:30:35  7      Your Honor.

14:30:35  8                    THE COURT:  You did?

14:30:36  9                    THE WITNESS:  Yes, we did.

14:30:37  10                   THE COURT:  Okay.  And had you gotten permission, I

14:30:42  11     guess, to go ahead and do that?

14:30:47  12                   THE WITNESS:  Correct.  When you enter the county

14:30:49  13     courthouse, there's an -- a lane to enter for law enforcement,

14:30:53  14     which we are law enforcement.  So we presented our credentials

14:30:57  15     and such, and we're allowed to enter into the courthouse.

14:31:01  16                   THE COURT:  Got you.  So had Mr. Coronilla resisted

14:31:06  17     or attempted to flee or not cooperate with you, would you have

14:31:10  18     then -- what would you have done?

14:31:15  19                   THE WITNESS:  I don't want to speculate, Your Honor.

14:31:17  20     I mean -- but, I mean, pretty much whatever -- you know, our

14:31:19  21     training.  We're trained.  We have policy and procedures on how

14:31:22  22     to effect an arrest.  And in his case it was something

14:31:26  23     different because we had media there, we had camera crews.  So

14:31:32  24     in that situation, I mean, he complied with us and we were able

14:31:35  25     to talk to him.

| | | |
|---|---|---|
| 14:31:36 | 1 | THE COURT:  But if he hadn't? |
| 14:31:38 | 2 | THE WITNESS:  If he -- there's a lot of what-ifs.  I |
| 14:31:42 | 3 | mean ... |
| 14:31:42 | 4 | THE COURT:  Yeah.  Okay.  So this isn't totally |
| 14:31:48 | 5 | germane, but you're here and it gives me an opportunity to ask |
| 14:31:53 | 6 | some questions because we've been wondering exactly what the |
| 14:32:01 | 7 | new policies will be because things have changed a bit. |
| 14:32:05 | 8 | THE WITNESS:  Okay. |
| 14:32:07 | 9 | THE COURT:  And an arrest in a courthouse was not |
| 14:32:09 | 10 | something that happened very often -- |
| 14:32:11 | 11 | THE WITNESS:  Right. |
| 14:32:12 | 12 | THE COURT:  -- prior to this. |
| 14:32:14 | 13 | But this was -- when I look at Mr. Coronilla's |
| 14:32:16 | 14 | criminal history here, his -- prior to this -- and it looks |
| 14:32:22 | 15 | like this is probably what led to his deportation -- he had an |
| 14:32:25 | 16 | arrest in January of 2008 where he was convicted of, looks |
| 14:32:29 | 17 | like, evading an arrest and unauthorized use of a vehicle when |
| 14:32:33 | 18 | he was 18.  Is that -- that looks like a misdemeanor to me.  He |
| 14:32:38 | 19 | got 180 days. |
| 14:32:39 | 20 | MR. MARSHALL:  No, sir.  That's a state jail felony. |
| 14:32:45 | 21 | THE COURT:  State jail felony?  Okay.  So he got 180 |
| 14:32:49 | 22 | days? |
| 14:32:49 | 23 | THE WITNESS:  Correct. |
| 14:32:51 | 24 | THE COURT:  Okay.  And ordinarily in the past there |
| 14:33:02 | 25 | haven't been arrests outside of the courthouse -- outside of |

| | | |
|---|---|---|
| 14:33:10 | 1 | the jail, I should say, for someone in those circumstances. |
| 14:33:13 | 2 | But that's changed. |
| 14:33:14 | 3 | THE WITNESS:  I would say for this instance what's |
| 14:33:17 | 4 | changed is the new policies by the Travis County Sheriff's |
| 14:33:21 | 5 | Office.  If this was prior to February 1st, the defendant would |
| 14:33:26 | 6 | have came to our custody through the detainer system -- |
| 14:33:29 | 7 | THE COURT:  Right. |
| 14:33:31 | 8 | THE WITNESS:  -- versus us having to get an arrest |
| 14:33:33 | 9 | warrant and, you know, present him to a court or present him to |
| 14:33:37 | 10 | the AUSA's office. |
| 14:33:40 | 11 | THE COURT:  But I thought -- when was the detainer |
| 14:33:42 | 12 | placed, the same day as his arrest on January 25th or 26th?  Or |
| 14:33:50 | 13 | I'm sorry.  Ninth?  It was like January 9th, I think. |
| 14:33:52 | 14 | MR. MARSHALL:  I belief the complaint says 10. |
| 14:33:54 | 15 | THE COURT:  Okay. |
| 14:33:55 | 16 | MR. MARSHALL:  And that would be when the detainer |
| 14:33:57 | 17 | was placed. |
| 14:34:00 | 18 | THE COURT:  I'm just looking at pretrial.  Okay. |
| 14:34:04 | 19 | MR. MARSHALL:  Yes, sir.  I understand. |
| 14:34:06 | 20 | THE WITNESS:  Correct.  January 10. |
| 14:34:07 | 21 | THE COURT:  Okay.  So a detainer would have been |
| 14:34:09 | 22 | placed then? |
| 14:34:17 | 23 | THE WITNESS:  A detainer was placed on the defendant. |
| 14:34:26 | 24 | THE COURT:  And I thought that new policies didn't |
| 14:34:28 | 25 | change until February 1st. |

14:34:32  1          THE WITNESS:  Correct.  And that's when the detainer

14:34:34  2  was declined and sent back to our office.  It was declined

14:34:44  3  and ...

14:34:48  4          THE COURT:  When was Mr. Coronilla released on bond

14:34:50  5  from Travis County?

14:34:56  6          THE WITNESS:  It was sometime after February 1st,

14:34:58  7  Your Honor.  I don't -- I don't know the exact same -- the

14:35:02  8  exact date that he bonded out.

14:35:03  9          THE COURT:  Well, it would have been prior to

14:35:06  10  February 3rd, the date of the complaint, because I presume that

14:35:09  11  complaint and warrant was served on the sheriff?

14:35:22  12          THE WITNESS:  Correct.

14:35:24  13          THE COURT:  And the detainer would have been served

14:35:31  14  before February 1st --

14:35:36  15          THE WITNESS:  Correct.

14:35:37  16          THE COURT:  -- which I thought that the sheriff was

14:35:41  17  honoring those detainers --

14:35:45  18          THE WITNESS:  Right.

14:35:46  19          THE COURT:  -- at that time.

14:35:46  20          THE WITNESS:  And she was.  What I -- what happened

14:35:50  21  was I don't know when the defendant actually paid the bond to

14:35:53  22  be released.

14:35:55  23          THE COURT:  Do you have any information on that,

14:35:58  24  Mr. Peterson?

14:35:59  25          MR. PETERSON:  I'm just relying on the ICE report

14:36:01   1   itself, the IA-31 that says subject was released by Travis

14:36:06   2   County Sheriff's Office prior to a warrant being placed on him.

14:36:10   3   And that's an addendum noted in the report with a date of

14:36:14   4   February 6th, 2017.  So it seems like that February 3rd warrant

14:43:50   5   didn't get placed.

14:43:58   6              THE COURT:  Before he was released?

14:44:00   7              MR. PETERSON:  According to ICE.

14:44:02   8              MR. MARSHALL:  There was a detainer pending in

14:44:10   9   January.

14:44:11  10              THE COURT:  That's what I'm trying to figure out.

14:44:22  11   Because ordinarily before February 1st, if a detainer had been

14:44:41  12   placed, ICE would have usually -- I mean, Agent Bryant, you can

14:44:47  13   fill me in here.  But usually you-all would have gone to the

14:44:51  14   courthouse -- I'm sorry -- to the jail, Travis County Jail,

14:45:22  15   shortly after the detainer and picked up Mr. Coronilla.

14:45:35  16              MR. MARSHALL:  Well, one thing we do is, if there's

14:45:39  17   pending state charges and the county's interested in pursuing

14:45:44  18   those charges, we'll leave the defendant.

14:45:46  19              THE COURT:  Right.

14:45:51  20              MR. MARSHALL:  The detainer is just a matter of

14:46:02  21   comity where they --

14:46:03  22              THE COURT:  But he got out on bond somewhere.

14:46:06  23              MR. MARSHALL:  Somewhere after February 1st.

14:46:08  24              THE COURT:  That's what I'm trying to figure out, was

14:46:11  25   it before or after February 1st.

14:48:18   1             MR. MARSHALL:  Don't know.  We filed the -- the

14:48:31   2   complaint, had the warrant issued, and tried to file it.  And

14:48:36   3   that was not -- the detainer was placed, and I think it was not

14:48:47   4   honored.

14:48:49   5             THE COURT:  Okay.

14:48:50   6             MR. MARSHALL:  Because we filed the detainers

14:48:57   7   immediately after -- well, I think you have something in front

14:49:05   8   of you.

14:49:05   9             THE COURT:  Okay.  I was just handed -- thank you.

14:49:12  10   Our crack staff here, the Pretrial Office, Mr. Nava, it's a

14:49:18  11   printout from Travis County's Web page that shows bond was

14:49:22  12   posted on January 10th, same day as the arrest.

14:49:27  13             MR. MARSHALL:  Yeah.  I don't know when he got out.

14:49:29  14             THE COURT:  So ...

14:49:30  15             MR. MARSHALL:  Could have been that.

14:49:32  16             THE COURT:  It would have been -- it sounds like the

14:49:34  17   day of or after his arrest he was -- he was already out on

14:49:38  18   bond.

14:49:38  19             THE WITNESS:  Uh-huh.

14:49:41  20             THE COURT:  So the detainer was either not -- you-all

14:49:48  21   weren't able to get to the jail, because, ordinarily, on

14:49:54  22   January 10th you would have been able to access the jail.

14:50:04  23             THE WITNESS:  Correct, Your Honor.  Like I said, what

14:50:06  24   normally happens is we'll place the detainer and Travis County

14:50:11  25   has, ultimate, the last control.  We don't -- just because we

14:50:15 1  place the detainer, not necessarily are we going that exact day

14:50:24 2  to pick him up.

14:50:25 3          THE COURT:  Let me go back a sec.

14:50:44 4          THE WITNESS:  Okay.

14:50:49 5          THE COURT:  So my understanding is that you placed a

14:50:51 6  detainer and then, ordinarily, old system, you-all would go

14:51:02 7  interview that person in the jail?

14:51:04 8          THE WITNESS:  Correct.

14:51:04 9          THE COURT:  Did that happen in this case?

14:51:06 10         THE WITNESS:  The Austin office did not because the

14:51:10 11 detainer was placed by our San Antonio Command Center.  At that

14:51:14 12 time they were using -- anytime they got a biometrics hit that

14:51:18 13 confirmed this individual was in custody, they were

14:51:27 14 automatically lodging a detainer.

14:51:29 15         THE COURT:  Right.  But then usually you follow up

14:51:32 16 and have an interview to confirm the identity?

14:51:36 17         THE WITNESS:  From our office I didn't see anything

14:51:38 18 in the file that indicated that somebody from our office --

14:51:41 19         THE COURT:  Correct.  Maybe that happened and he got

14:51:48 20 bonded out before even that step had occurred?

14:51:51 21         MR. MARSHALL:  Could be.

14:51:51 22         THE WITNESS:  Could be.

14:51:52 23         THE COURT:  Okay.  All right.  Well, I got

14:51:56 24 distracted.

14:51:57 25         So my question was that -- that the policy seems to

14:52:02  1  be changing.  I'm just trying to get a sense where we are now

14:52:06  2  and what we can expect as far as arrests.  And, you know,

14:52:17  3  there's a lot of different things have been published and

14:52:20  4  nobody's -- you know, we don't know for sure what to expect.

14:52:24  5  Maybe you know.  If you don't, fair enough.

14:52:27  6          But this arrest occurred at the direction of your

14:52:30  7  field office director?

14:52:31  8          THE WITNESS:  Correct.

14:52:37  9          THE COURT:  Okay.  And, you know, there's been

14:52:40 10  questions about whether Austin's being targeted, and we have --

14:52:54 11  we had a briefing that your immediate supervisor, I guess,

14:53:01 12  Agent Shaffer --

14:53:02 13          THE WITNESS:  Yes, sir.

14:53:03 14          THE COURT:  -- came and briefed me and the magistrate

14:53:12 15  judge, Judge Lane, that -- at the very end of January that we

14:53:17 16  could expect a big operation or agents coming in from out of

14:53:22 17  town.  There was going to be a specific operation, and it was

14:53:27 18  at least related to us, in that -- meaning that it was a -- it

14:53:30 19  was a result of the sheriff's new policy that this was going to

14:53:35 20  happen.  Are you aware of that?

14:53:37 21          THE WITNESS:  Yes, Your Honor.

14:53:38 22          THE COURT:  Okay.  And that's the one we heard about

14:53:42 23  where 50-some-odd people were arrested.

14:53:58 24          THE WITNESS:  Yes, Your Honor.

14:54:00 25          THE COURT:  Okay.  And my -- my understanding is what

14:54:05  1   was told us is one of the reasons that happened was because the

14:54:08  2   meetings that occurred between the field office director and

14:54:11  3   the sheriff didn't go very well.

14:54:14  4            THE WITNESS:  That's -- that's new knowledge to me,

14:54:17  5   Your Honor.

14:54:17  6            THE COURT:  Above your pay grade?

14:54:18  7            THE WITNESS:  Yes.  Yes.

14:54:19  8            THE COURT:  All right.  Fair enough.  Fair enough.

14:54:21  9            All right.  Do you anticipate or do you know whether

14:54:24 10   we're going to continue to have arrests like this one

14:54:30 11   occurring, or is it going to be, you know, where it's --

14:54:33 12   there's targeted people outside of the jails that you're going

14:54:36 13   to try to be picking up in addition to what you were doing

14:54:40 14   before the sheriff's policy changed?

14:54:43 15            THE WITNESS:  As far as I know, this incident was an

14:54:47 16   isolated incident.  This wasn't the norm.  This is not

14:54:51 17   something that is going to become pattern of practice, so to

14:54:55 18   speak, that we're going to go to the courthouse and --

14:54:58 19            THE COURT:  Not so much the courthouse.  But just in

14:55:00 20   general, whether we can expect more arrests, more prosecutions,

14:55:04 21   than we were prior to this.

14:55:08 22            THE WITNESS:  I would say just say, based off the new

14:55:10 23   administration and the priorities or them doing away with the

14:55:25 24   prior administration's --

14:55:30 25            MR. MARSHALL:  I've got to stop him at this point.

BRYANT - REDIRECT                                    28

| | | |
|---|---|---|
| 14:55:37 | 1 | He can't talk about that right now, and I don't want |
| 14:55:40 | 2 | him to get in trouble. |
| 14:55:41 | 3 | THE COURT: Fair enough. Fair enough. All right. |
| 14:55:43 | 4 | MR. MARSHALL: I can answer most of those questions, |
| 14:55:45 | 5 | if you want an answer. |
| 14:55:46 | 6 | THE COURT: I mean, sure. If you -- |
| 14:55:47 | 7 | MR. MARSHALL: Make sure we're done with him. |
| 14:55:49 | 8 | THE COURT: Yeah. I have no more questions. |
| 14:55:50 | 9 | MR. MARSHALL: I just have a couple. |
| 14:55:52 | 10 | THE COURT: And you might have some, and I'll let |
| 14:55:54 | 11 | Mr. Peterson ask some. |
| 14:55:55 | 12 | **REDIRECT EXAMINATION** |
| 14:55:55 | 13 | **BY MR. MARSHALL:** |
| 14:55:55 | 14 | Q.   You said you had your credentials when you went over |
| 14:56:03 | 15 | there.  Were you wearing a suit like you're wearing today? |
| 14:56:11 | 16 | A.   No, I was not. |
| 14:56:12 | 17 | Q.   Okay.  So you just had your badge on your belt? |
| 14:56:14 | 18 | A.   Correct. |
| 14:56:15 | 19 | Q.   That was it? |
| 14:56:16 | 20 | A.   Correct. |
| 14:56:16 | 21 | Q.   Okay. |
| 14:56:17 | 22 | THE COURT: Mr. Peterson, any questions? |
| 14:56:19 | 23 | MR. PETERSON: No, Your Honor. I have no further |
| 14:56:23 | 24 | questions. |
| 14:56:24 | 25 | MR. MARSHALL: Thank you. |

| | | |
|---|---|---|
| 14:56:26 | 1 | THE COURT:  You may step down.  I appreciate it. |
| 14:56:28 | 2 | Sorry to grill you on the administrative policy -- or |
| 15:14:04 | 3 | administration and the policy. |
| 15:14:06 | 4 | MR. MARSHALL:  I understand your curiosity, and I've |
| 15:14:09 | 5 | got -- and it doesn't really go to probable cause, but I |
| 15:14:19 | 6 | understand what we're doing.  When this initially occurred, I |
| 15:14:21 | 7 | was actually the attorney that handled this for the U.S. |
| 15:14:23 | 8 | Attorney's Office.  We were told that there were a number of |
| 15:14:26 | 9 | people -- there were two separate operations going on. |
| 15:14:34 | 10 | There were a bunch of people that were deportable, |
| 15:14:39 | 11 | and my understanding is that was a separate action.  But that's |
| 15:14:42 | 12 | part of the big operation that Mr. Shaffer was talking about. |
| 15:14:45 | 13 | Those are not cases we deal with. |
| 15:14:47 | 14 | THE COURT:  Right. |
| 15:14:48 | 15 | MR. MARSHALL:  All the time. |
| 15:14:50 | 16 | THE COURT:  And you remember the days ten years ago |
| 15:14:52 | 17 | when we dealt with a lot of the cases. |
| 15:14:54 | 18 | MR. MARSHALL:  Right.  And that ain't going to come |
| 15:14:57 | 19 | back as far as I know.  Now, as the agent indicated, we've got |
| 15:15:01 | 20 | a new administration and I have no clue what's happening.  And |
| 15:15:11 | 21 | I can tell you that I have no new direction from the Attorney |
| 15:15:17 | 22 | General, and I have no new direction from the Immigration and |
| 15:15:22 | 23 | Customs Enforcement people or from HSI.  And so that, as far as |
| 15:15:35 | 24 | a policy matter, if it's going to change, is still in D.C. |
| 15:15:42 | 25 | THE COURT:  It's got a ways -- |

15:15:44  1              MR. MARSHALL:  We've got no direction.

15:15:49  2              THE COURT:  It's got a ways to go.

15:15:51  3              MR. MARSHALL:  It does.  And I suspect that's going

15:15:53  4  to be several months down the road.  They have other things

15:16:06  5  they're dealing with.  With regard to this particular

15:16:15  6  operation, that 50-some-odd person deal was both civil and

15:16:25  7  possibly criminal.  In other words -- and a lot of people don't

15:16:27  8  understand this -- a big part of the immigration system is a

15:16:30  9  civil action.  You have people that are deportable for whatever

15:16:36 10  reason that we never deal with, and then you have people that

15:16:42 11  are -- have illegally reentered or illegally entered the United

15:16:46 12  States.  That's what we deal with.

15:16:50 13              In that respect I can tell the Court that there was

15:16:53 14  no huge increase.  I think you saw a bump, but that was due to

15:16:57 15  the policy change, where we had to actually get complaints

15:17:00 16  filed right away and get a warrant issued.  My understanding is

15:17:04 17  that the sheriff will honor a warrant if it's filed on time.

15:17:08 18              I think part of the deal with this case was it was in

15:17:11 19  transition.  Nobody really knew what that meant or who was

15:17:14 20  going to do what or what will be honored or not.  I can tell

15:17:18 21  you that the sheriff's indication that they would honor a

15:17:20 22  warrant came well after January 10th.  That was late January,

15:17:24 23  early February.

15:19:57 24              THE COURT:  And my confusion was we were still

15:20:03 25  getting arrests in the end of January.  I know because I was on

15:20:11   1   duty.

15:20:11   2            MR. MARSHALL:  Sure.

15:20:12   3            THE COURT:  It's March.

15:20:13   4            MR. MARSHALL:  So was I.

15:20:14   5            THE COURT:  So it's March, so I'm back again.  But we

15:20:18   6   were still getting them sort of in the traditional sense.  They

15:20:33   7   were bringing them from Travis County Jail the same day --

15:20:36   8            MR. MARSHALL:  Right.

15:20:36   9            THE COURT:  -- to the ICE office and then over here

15:20:48  10   by 11:00, like you've been doing.

15:20:49  11            MR. MARSHALL:  And I suspect the vast majority will

15:20:52  12   continue to be that way.  As I said, my understanding is the

15:20:55  13   sheriff will honor a warrant.  So as long as the warrant is

15:21:00  14   filed, and that's why we issued a number of complaints --

15:21:06  15            THE COURT:  At the end --

15:21:07  16            MR. MARSHALL:  -- to get warrants at the end of

15:21:09  17   January.  That was just to make sure that the sheriff had a

15:21:12  18   warrant on file and would honor the detainer.

15:21:15  19            Normally you wouldn't see that bump because, as you

15:21:18  20   said, we like to let the state process run.  They have custody

15:21:22  21   of the defendant.  If they have charges they want to pursue,

15:21:25  22   they can pursue them.  That's up to the DA.  That's why we

15:21:28  23   would file the detainer and say, hey, when you're done with

15:21:30  24   them, we need them over here because we have a federal

15:21:34  25   violation.  Because of the flux, that's why you've got that

```
15:21:38   1  bolus of complaints.

15:21:39   2         In my experience -- and I think you'll see this in

15:21:42   3  the coming month -- the number of cases we're filing is

15:21:50   4  deplete -- is coming back to basically where it was before

15:21:55   5  because there's been no policy change.  We're still dealing

15:21:59   6  with people that are convicted felons, people that have been

15:22:03   7  arrested, people that have a certain matrix.  There's no

15:22:12   8  specific set policy.  But, as the Court knows, that's pretty

15:22:16   9  much what we file.  And that's where we are.  There's been no

15:22:19  10  huge change in policy.  This was a procedural deal based on a

15:22:26  11  new administration.  So that's all.

15:22:33  12         THE COURT:  Okay.  It's always concerning when

15:22:47  13  somebody gets arrested in the courthouse and the situation.

15:23:12  14  I'm glad -- it's better than I thought it was.

15:23:15  15         MR. MARSHALL:  No.  And one of the reasons --

15:23:16  16         THE COURT:  It's still a little dangerous.  I mean,

15:23:19  17  had Mr. Coronilla not been cooperative and started running

15:23:28  18  around the courthouse --

15:23:28  19         MR. MARSHALL:  Well, I understand that.  But then

15:23:31  20  again --

15:23:31  21         THE COURT:  -- there's no telling what would have

15:23:37  22  happened.

15:23:37  23         MR. MARSHALL:  These agents approached in a

15:23:39  24  reasonable and professional manner, notified law enforcement,

15:23:42  25  both at security and up at the courthouse bailiff.  They did
```

15:23:46   1   not hang in the courtroom.  Mr. -- this defendant,

15:23:54   2   Mr. Coronilla, was actually with his attorney.

15:23:57   3          THE COURT:  Right.

15:23:57   4          MR. MARSHALL:  Quite frankly, in a public place, in a

15:24:00   5   courthouse with a bunch of judges and your attorney, if I had

15:24:04   6   to be arrested, that's pretty much what I'd want.  I'm standing

15:24:16   7   by counsel, and I'm safe.

15:24:19   8          THE COURT:  I agree if everything goes well.  It's

15:24:26   9   just when you have somebody --

15:24:30   10          MR. MARSHALL:  And I'm not -- I'm not advocating that

15:24:33   11   one way or the other.  Quite frankly, that is a -- a

15:24:43   12   enforcement measure that I have nothing to say about.  It's up

15:24:46   13   to the law enforcement agency.  But I've got to say, in this

15:24:50   14   instance, the agents acted professionally, they acted

15:24:53   15   appropriately, they weren't overbearing.

15:24:55   16          THE COURT:  And look.  I mean, we -- you know, I see

15:24:58   17   Agent Bryant and Agent Warren and Agent Mathis all the time.

15:25:03   18   They're very professional.  They do a great job.  And I

15:25:10   19   don't --

15:25:10   20          MR. MARSHALL:  And that's what they have to do.

15:25:17   21          THE COURT:  Yeah.  All right.  I appreciate it.

15:25:21   22          All right.  On the issue of probable cause, I do find

15:27:55   23   that there is sufficient evidence to find that it is probable

15:27:59   24   that Mr. Coronilla-Guerrero did violate Title 8, 1326.  So I'll

15:28:06   25   hold the case over for presentment of that case to the grand

15:28:09   1   jury for indictment.

15:28:10   2             Anything else in this case that we need to address at

15:28:17   3   this time?

15:28:18   4             MR. MARSHALL:   Nothing from the government.

15:28:20   5             MR. PETERSON:   No, Your Honor.   Thank you.

15:28:24   6             THE COURT:   Thank you.   You-all may be excused.

15:28:27   7         (Proceedings concluded at 10:36 a.m.)

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

1                    **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3   was transcribed from an electronic recording made at the time

4   of the aforesaid proceedings and is a correct transcript, to

5   the best of my ability, made from the proceedings in the

6   above-entitled matter, and that the transcript fees and format

7   comply with those prescribed by the Court and Judicial

8   Conference of the United States.

9

10  /S/ Arlinda Rodriguez                    March 29, 2017

11  ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25